**STATE v. GUARDIAN FOUNDATION OF TEXAS, Inc.**

No. 8782.

Court of Civil Appeals of Texas. Austin.

April 5, 1939.

Motion for Rehearing Overruled May 24, 1939.

Wm. McCraw, Atty. Gen., Jno. J. McKay and Charles N. Avery, Jr., Assts. Atty. Gen., Dan Moody, of Austin, and Martin & Moore, of Fort Worth, for appellant.

Claude C. Westerfeld, of Dallas, and Henry H. Brooks, of Austin, for appellee.

McCLENDON, Chief Justice.

This is a quo warranto proceeding brought by the State to forfeit the charter of appellee, a corporation chartered under Subdivision 41, Art. 1302, R.C.S., "To do a general advertising business." The case was formerly before us upon appeal from an interlocutory order denying an application for a receiver and an injunction. Tex. Civ.App., 112 S.W.2d 806.

Since we are holding that the judgment must be reversed because of improper argument of appellee's counsel, the only

other question necessary to decide upon this appeal is whether the evidence conclusively establishes as a matter of law the State's asserted right to forfeit appellee's charter. This question presents two main issues: (1) whether, as a matter of law, the business conducted by appellee was ultra vires, that is was not advertising, or an advertising business; and (2) whether such business was within the inhibitions of Art. 580a, V. A. P. C.

While the point was not decided upon the former appeal, we pointed out that a statute similar to said Art. 580a had been declared invalid by the Supreme Court of Rhode Island. Prata Undertaking Co. v. State Board, 55 R.I. 454, 182 A. 808, 104 A.L.R. 389. Since the submission of this case upon the instant appeal our Court of Criminal Appeals has held Art. 580a unconstitutional. Phillips v. State, 125 S.W. 2d 585. That decision forecloses the question of the illegal character of appellee's business, if in fact any part of it falls within the inhibitions of that article. This subject therefore requires no further notice.

The trial court submitted two special issues to the jury, which, with their answers, read:

"1. Do you find from a preponderance of the evidence that the defendant, Guardian Foundation of Texas, Inc. is not doing an advertising business as the term 'advertising business' is generally understood by persons engaged in that business?"

Answer: "It is doing an advertising business."

"2. Do you find from a preponderance of the evidence that the interest of the public generally will be benefitted by forfeiture of the charter of the defendant, Guardian Foundation of Texas, Inc.?"

Answer: "No."

Upon this verdict judgment was rendered for appellee, and the State has appealed.

While the statement of facts (475 pages) contains a volume of testimony we deem it unnecessary to attempt a detailed statement of it. A finding to the effect that the general character of appellee's business was substantially that set forth in our former opinion in the quotation from appellee's brief at pages 807 and 808 of 112 S.W.2d, finds ample support in the evidence. We shall not repeat that quotation here, but refer to the former opinion.

The expert testimony upon the issue whether such business came within the meaning of advertising as that term is generally understood by those engaged in the advertising business was sharply conflicting.

Mr. John A. Keen, properly characterized by appellant as "an extremely well qualified advertising expert," gave his opinion that appellee's business was not properly classified as advertising, basing that opinion upon the fact that it was lacking in what he regarded as one of the fundamental criteria or tests of advertising, namely, that the consumer does not pay (directly, at least) for the publicity that the advertiser puts out to sell his goods. To quote from his testimony: "No publicity is advertising unless the person or business advertised pays the bill for the information disseminated, and the circumstance that the advertising bill is charged in as a part of the advertiser's overhead and ultimately paid by the consumer is immaterial." And further: "We do not consider that a man that buys a magazine is paying for the advertising—the commercial world doesn't consider that."

On the other hand, Mr. Sig H. Badt, a member of the Southwestern Advertising Agency, President of the Dallas Advertising League, and advertising manager of the Dallas Dispatch, testified: "I am convinced it would be the opinion of advertising people generally that that Company would be in the advertising business."

He amplified his views as follows:

"It is based fundamentally upon this principle that any Company that is engaged in publicity, in the creation of publicity and promotional ideas to advertise merchandise, either a product or a business, is engaged in the advertising business. This second Company has a program and a plan which is based upon publicity through their magazine and through their representatives; they disseminate information and have a circulation for it. The fact that it is paid for would not reject it. A daily paper or a magazine is an advertising medium, and they are paid for, for they disseminate information and they create publicity. They have a plan worked out to build business through publicity and to make people think and act as the advertiser desires. For that reason, it is advertising. * * *

"From an advertising standpoint it is customary for the person who is doing the advertising, that is, who is putting out the

literature and information, to insist on an inspection and report of whatever is necessary from the person who is being advertised in such a way as to show that the things advertised are true. * * * For an advertising agency has as its responsibility to see that the product that it is advertising is legitimate and worth the money. The Good Housekeeping magazine has its Good Housekeeping Institute to test the products advertised in its pages, and they refuse to accept advertising or place their stamp of approval until these products have met with their specifications, and any responsible advertiser that took on an advertising account would owe it to himself to see that the products advertised are worth the money and that the business is handled on a fair and equitable basis. * * *

"If you called in fifty advertising men and said: 'Work out a plan,' they would come back with fifty different plans."

█ This evidence was manifestly sufficient to raise a fact issue upon the character of appellee's business regarding whether it falls within the meaning of the term "advertising" as understood by those engaged in the business.

In our original opinion we said [112 S. W.2d 808]: "Modern advertising is conducted under a wide variety of methods, and its limitations are not readily nor precisely definable." This view seems well supported by the following quotations from standard texts used in the Business Administration course in the University of Texas:

"According to one point of view, the purpose of advertising is to make a product known, but not to sell it. According to the second point of view, the purpose of advertising is not only to make a product known, but also to sell or help sell it. The former is the initial conception, derived from the original meaning of the Latin word advertere, to turn toward.

"Advertising at the present time means, of course, much more than that; it means more than merely announcing, making known, or turning the attention of the public toward a certain product. Its ultimate purpose is to sell or to help sell. This is the prevailing notion today, and, in the last analysis, it is the real reason for its existence." Principles of Advertising, 1925, by Daniel Starch, Ph. D. Associate Professor of Business Psychology, Graduate School of Business Administration, Harvard University, pp. 3 and 4.

"No specific definition of the term advertising has been accepted, even in advertising circles. The word advertising is used to express a great many variations in the public promotion of business. * * *

"Advertising is one of the methods employed in the marketing of goods. Its value depends upon its use in connection with the physical distribution of goods and other marketing necessities." Advertising Fundamentals, Vol. 1, pp. 10, 11, by various co-authors, published by New York Association Press, 1922.

"They (advertising campaigns) are justified, if they produce results, not otherwise. They are not planned and executed for the purpose of making demonstrations of theories, but always to sell goods." Advertising Campaigns, 1923, p. 356, by Tipper and French.

█ Appellant contends that appellee's business is not a "general" advertising one, even if it be otherwise properly classified as advertising. We do not regard the point as having substantial merit. If by the word "general" is meant every form of advertising, then it is manifest that it would be quite difficult, if not impossible, to find any concern that could qualify as doing a "general" advertising business. This would include the press, the radio, circularization, lectures and addresses, musical and other forms of entertainment, propaganda, personal contact and solicitation, and in fact an infinite variety of plans, schemes, and devices designed to attract or "advert" attention to a particular commodity or other thing, with the objective of promoting its immediate or ultimate purchase, use or patronage. The charter powers of appellee are stated in the exact wording of the enabling statute. The fact that the charter powers are broader than the business in which the corporation is engaged is not a valid ground for forfeiture of its charter privileges, in the absence of some rule of public policy which would require it to engage in every form of business its charter would authorize. No principle of public policy which would require a user of every power authorized by its charter is suggested. Once it is conceded that its business is a legitimate one, that it is not inhibited by any rule of public pol-

icy, and that it may properly be classed as advertising, we can conceive of no valid ground for forfeiture of its charter. If it were necessary that the particular form of advertising in which it is engaged should be stated in the charter, this requisite could readily be met by charter amendment.

The complained of argument of appellee's counsel to the jury was as follows:

"This is in truth and in fact a contest between a powerful Association of Undertakers, organized for profit, and to prevent anyone from interfering with their business; they are no doubt according to the evidence, a strong trust because they have had their attorney, Jesse Martin, for the past four years camped in the Attorney General's and Secretary of State's office, urging these departments to put out of business the Guardian Foundation that has cut the cost of dying about 500 per cent; they have caused this organization to be examined and re-examined various times, and finally induced the Attorney General to bring this suit, and are having the former Governor Moody to assist them in the trial who admits he is hired by the Undertakers; you know Governor Moody and the Powerful Jesse Martin don't try these suits for love and affection, and I would wager, that they have been out more than $10,000 attorney fees, because you know the Former Governor charges a plenty; and now since I have discussed the attorney's fees on the other side, I should tell this jury my connection with the case. I volunteered my services in payment of the hotel bills, which to date is about $12.00. I have been interested in the exorbitant charges of Undertakers in comparison with the costs for years; about 8 years ago I ran for the Legislature, and had two planks; first: I told the people if elected that I would see that the Undertakers did not take the last $1,000 of deceased at a time the family did not feel like making a bargain or making any objection to costs; second: that I would also see that the Workingman Compensation Insurance Companies used a New Parts Price List of at least A New Ford instead of a second hand list for the valuing of the various parts of the human body. I have been trying to represent the 99.9% of the people of this State who have little or no representation in the Legislature, and I feel that the biggest service I can do for them is to prevent the Organized Undertakers of this State from putting this concern out of business."

The argument was not objected to at the time it was made, and appellee contends: (1) that it constituted "a legitimate comment upon the evidence concerning the activities of the Funeral Directors Association and the special prosecutors hired by that association, in furtherance of this case"; and (2) that appellant should have objected at the time and not "gambled on the possibility of receiving a favorable verdict."

The first contention is correct in part only. In addition to such legitimate comment, the argument went entirely outside the record in detailing the circumstances of counsel's employment and his political activities in the interest of certain classes of citizens. However laudable and patriotic these activities may be regarded, they had no proper place in the determination of this case upon its merits. The contest here was between the State and the appellee, and the issue was whether the latter's business fell within its charter powers. The argument was an appeal to sentiment and prejudice and was calculated to induce the jury to render its verdict, not upon the merits of the case, but upon the demerits of the Funeral Directors Association, the benefit to the public of appellee's business, and the value to the public of counsel's outstanding political services. To this extent the argument, based upon matters entirely outside the record, was manifestly improper and prejudicial, and of that character the prejudicial effect of which the courts hold can not be removed by direction of the trial court not to consider. It is not necessary to cite authority upholding the now generally accepted rule that objection to such argument need not be made at the time under penalty of waiver.

The trial court's judgment is reversed and the cause remanded.

Reversed and remanded.